**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert M. BURTON, Peter Balogun,**
**Defendants–Appellants.**

No. 88–7347.

United States Court of Appeals,
Eleventh Circuit.

May 5, 1989.

---

Ira De Ment, Roianne Houlton Frith, William Terry Travis, George L. Beck, Jr., P.C., Montgomery, Ala., Fred D. Gray, Tuskegee, Ala., for defendants-appellants.

Charles R. Niven, Asst. U.S. Atty., George L. Beck, Jr., Montgomery, Ala., for plaintiff-appellee.

Before JOHNSON, HATCHETT and COX, Circuit Judges.

PER CURIAM:

In a five-count indictment, Defendants Balogun and Burton were charged with one count of embezzlement and four counts of conspiracy to embezzle in violation of 18 U.S.C. §§ 641 and 371 (1982). Following a jury trial, each was convicted on the embezzlement count and on one count of conspiracy to embezzle. This appeal followed, and we affirm.

I. BACKGROUND

Macon County Community Action Committee (MCCAC) is a community action agency located in Macon County, Alabama, that was organized in 1965 under the auspices of Health Education and Welfare and Office of Economic Opportunity and pursuant to the Community Development Act, 42 U.S.C. §§ 5301–20 (1982 & Supp. II 1984).

It functions as an "umbrella" agency, overseeing and promoting various federal- and state-funded programs for underprivileged individuals. At all times in question, Balogun served as Executive Director of MCCAC and Burton served as its Property Officer.

One of the programs administered by MCCAC was Head Start, an early childhood intervention program that was established to provide comprehensive medical, nutritional, educational, dental, and social services to low income families. The Head Start program received 80% of its funding from the federal government and 20% from state and local governments and private sources. Federal funds were provided on the condition that they only be expended for purposes consistent with the goals of Head Start.

Concurrently with its administration of Head Start, MCCAC directed numerous other non-profit, federally-subsidized social programs. In the mid–1970s, it became apparent that federal funding for those programs might not be available indefinitely. In fact, through the Economic Opportunity Act, 42 U.S.C. §§ 2701–2996k (1982 & Supp. II 1984), Congress explicitly encouraged community action agencies to establish community development committees—non-profit subsidiaries that could explore and cultivate local economic opportunities. The community development committees, moreover, were authorized to purchase for-profit businesses. Ultimately, it was hoped, profits generated by those businesses could be used to supplement and, eventually, to supplant federal funding for programs managed by community action agencies.

To insure a steady supply of funds for its programs, MCCAC established a wholly-owned subsidiary, the MCCAC Community Development Corporation (MCCDC) which, in turn, formed a for-profit, wholly-owned subsidiary, the MCCAC Economic Development Corporation (MCEDC). MCEDC was authorized to purchase for-profit businesses for the purpose of establishing a private source of funding for MCCAC-administered programs.

In 1978, MCEDC purchased two for-profit concerns, Babco Service Station (Babco) and G's Restaurant (G's). By 1981, it had become apparent that the establishment of MCEDC and purchases of Babco and G's disastrously had failed to satisfy the objective of raising funds for MCCAC-administered programs. Dreams of plentiful profits turned to nightmares of cash shortages as the businesses began to require significant infusions of cash to stay afloat.

To satisfy obligations of Babco and G's, MCCAC's management implemented an interagency loan plan pursuant to which certain employees of MCCDC, MCEDC, Babco, and G's submitted requisition requests to MCCAC for loans to cover operating expenses. Funds were taken from various MCCAC accounts, including the Head Start account, to cover the loans. As Executive Director of MCCAC, Balogun was responsible for authorizing all such disbursements.

As early as July 1981, the Department of Health and Human Services (HHS) became aware of the fact that interagency loans were being made from the Head Start account to various MCCAC concerns. By September 1981, MCCAC was informed that the use of federal Head Start funds for such purposes was strictly prohibited since the loans were not intended to fulfill permissible objectives of the Head Start program. Additionally, MCCAC was ordered to restore all missing funds to the Head Start account. HHS' reprimand went unheeded as the practice of interagency loans continued undaunted.

By October 1982, Babco and G's were on a "cash basis" with most creditors, making it necessary for all payments to be made in cash or its equivalent. When bills came due, requisition requests were sent to MCCAC. Then, checks were written on various MCCAC accounts, including the Head Start account, and made payable to the order of Robert Burton. Presumably, Burton would cash the checks and use the proceeds therefrom to pay the creditors.

Rather than phase-out the for-profit element of the MCCAC, the MCEDC, in January, 1983, purchased a third for-profit con-

cern, Tuskegee Wholesale Grocery (Wholesale), in an effort to raise funds for MCCAC-administered programs. Unfortunately, ownership of Wholesale exacerbated, rather than alleviated, the cash-flow problems of the MCEDC, and the interagency loans continued.

Ultimately, the Head Start loans were sufficient only to sustain, and not to resuscitate, the failing businesses. In 1985, federal funding for the Head Start program was revoked as a consequence of the repeated interagency loan abuses. Shortly thereafter, MCEDC, Babco, G's, and Wholesale went bankrupt.

Balogun and Burton were indicted in 1987 for embezzlement and conspiracy to embezzle in connection with the interagency loan activities. Following trial, Balogun and Burton were convicted on one count of embezzlement and on one count of conspiracy to embezzle.

## II. DISCUSSION

On appeal, appellants present four major claims of error. First, appellants claim that the evidence was insufficient to support their convictions and that they, therefore, are entitled to judgments of acquittal. Second, appellants contend that the district court committed reversible error when it, over timely objection, allowed an F.B.I. agent to testify as to the nonexistence of a cashier's check. Third, appellants strenuously argue that the district court abused its discretion when it failed to grant a new trial on the basis of newly discovered evidence. Finally, appellants argue that the district court erred when it failed to grant appellants' motion to dismiss on the basis that the indictment contained duplicitous counts which rendered the indictment invalid. The issues presented are discussed *seriatim.*

### A. *Insufficiency of the Evidence*

In assessing an allegation that a jury verdict is insufficiently supported by the evidence, this court must construe the evidence in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982). The verdict will be upheld if "a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### 1. Embezzlement

Section 641, 18 U.S.C., makes it a federal crime or offense for anyone to embezzle any money or property belonging to the United States having a value of more than $100.[1] To support a conviction for embezzlement under 18 U.S.C. § 641 (1982), the government must prove the following: (1) that the money or property described in the indictment belonged to the United States or an agency thereof and had a value in excess of $100 at the time alleged; (2) that the property lawfully came into the possession or care of the defendant, and the defendant fraudulently appropriated the money or property to his own use or the use of others; and (3) that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property so taken. *See United States v. Bailey,* 734 F.2d 296, 303 (7th Cir.1984), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1985). *See also United States v. Shackleford,* 777 F.2d 1141 (6th Cir.1985) *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663

---

1. In pertinent part, 18 U.S.C. § 641 (1982) provides as follows:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof ...; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; ....

(1986); *United States v. Waroneck*, 582 F.2d 1158 (7th Cir.1978).

In the present case, count four of the indictment charged Balogun and Burton with willfully, knowingly, and without authority embezzling and converting to their own use and the use of others "moneys [sic] of the United States Department of Health and Human Services and other agencies of the United States in the amount of approximately Five Thousand Dollars ($5000)." Evidence introduced by the government showed that on April 14, 1983, a $5000 check, signed by Balogun and Burton, was issued on the MCCAC–CDC Membership Drive Fund account to the order of Burton. The testimony at trial and the requisition request pursuant to which the check was written indicated that the check proceeds were to be used for the payment of MCEDC's payroll taxes, an impermissible use of the involved federal funds. Further evidence showed that Burton cashed the check at the drive-through window of the Alabama Exchange Bank. Burton testified that after cashing the check, he purchased either a cashier's check or a money order to send to the I.R.S. for the payment of MCEDC's payroll taxes; however, he could not recall where he purchased the check or money order, and no evidence was introduced indicating that a check or money order had been obtained. Burton asserted that after he purchased the check or money order, he took it to the MCCAC office and gave it to a staff member for mailing. An I.R.S. representative testified that no payment for payroll taxes had been received from MCEDC on or about April 14, 1983. The jury reasonably could infer that Burton had cashed the MCCDC check, failed to procure a money order or cashier's check, and, instead, appropriated the check proceeds to his own use.

For several reasons, we conclude that a reasonable jury could find that the evidence introduced establishes, beyond a reasonable doubt, that Balogun and Burton willfully and knowingly diverted federal funds from the MCCDC account to Burton's personal use. First, the evidence indicates that Balogun authorized and co-signed the involved check with knowledge that the funds involved could not be used for Burton personally. Second, the evidence shows that Burton co-signed the check with knowledge that the proceeds thereof could not be used for his personal benefit. Finally, there was a total absence of any evidence indicating that a cashier's check or money order had been purchased by Burton, and there was corroborating testimony of the I.R.S. agent to the effect that a payment had not been received from MCEDC during the period in question.

### 2. Conspiracy to Embezzle

■■ Section 371, 18 U.S.C., makes it unlawful for two or more persons to conspire to commit any offense against the United States or any agency thereof.[2] To sustain a conspiracy conviction under 18 U.S.C. § 371 (1982), there must be proof of an agreement among two or more persons to accomplish something that constitutes an offense against the United States and an overt act by one of them in furtherance of that agreement. *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940). *See also United States v. Tombrello*, 666 F.2d 485, 490 (11th Cir.1982) *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). Secrecy being the essential nature of the conspiracy, "such an agreement may be proved by circumstantial as well as direct evidence." *United States v. Browning*, 723 F.2d 1544, 1546 (11th Cir.1984). To support a finding that a particular defendant was a member of the conspiracy, the government must prove "that a conspiracy existed, that [the defendant] knew of it and that he intended to associate himself with the objectives [thereof]." *United States v.*

---

**2.** In pertinent part, 18 U.S.C. § 371 (1982) provides as follows:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*Horton,* 646 F.2d 181, 185 (5th Cir.1981) *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981).

In the present case, count one of the indictment charged Balogun and Burton with willfully and knowingly conspiring and agreeing to violate 18 U.S.C. § 641 by embezzling and converting to their own use and the use of others monies of agencies of the United States. Specifically, the indictment charged Balogun and Burton with transferring federal Head Start funds, under the guise of interagency loans, from the Head Start account to other accounts to operate Babco, G's, and Wholesale. It further charged that Balogun and Burton issued checks to Burton on the Head Start account and that Burton, in turn, converted those checks to cash. Additionally, the indictment enumerated ten overt acts which were committed in furtherance of the conspiracy. Because the government only needed to prove one of those acts to sustain the conspiracy convictions and because we conclude that the government satisfied that burden, we limit our discussion to one of those acts.

The government established that on August 5, 1982, Balogun and Burton issued a $17,500 check on the Head Start account to the MCCAC–CDC Membership Fund Drive account. Records maintained by the MCCAC indicated that the proceeds of the check were to be considered an interagency loan. On that same date, two checks were written on the MCCAC–CDC Membership Fund Drive account; one for $1,000 was issued to Burton and, presumably, was intended for the purchase of "supplies" for G's, Babco, and Wholesale. Evidence showed that Burton cashed the $1,000 check; however, the evidence did not establish that Burton used all of the proceeds for the purchase of supplies, giving rise to an inference that Burton pocketed the excess proceeds.

The August 5, 1985, check was only one among several that were written on the Head Start account, signed by Balogun and Burton, the proceeds of which were channeled to other MCCAC-administered programs. On several occasions, funds drawn on the Head Start account were deposited into a MCCDC or a MCEDC account and, immediately thereafter, checks were written to Burton on those accounts. The record is devoid of evidence that Burton used all of the cash proceeds from those checks to pay for expenses of MCCAC, MCCDC, MCEDC, G's, Babco, or Wholesale.

We conclude that sufficient evidence was presented to establish that Balogun and Burton actively and willfully engaged in an unlawful scheme to appropriate federal Head Start funds to the use of other MCCAC-administered programs and to Burton's personal use. Each was instrumental in conducting the prohibited activities—Balogun, because he authorized and co-signed checks that were written on the Head Start account, and Burton, because he co-signed Head Start checks and, as Property Officer, facilitated the diversion of funds from the Head Start account to other sources. Considered in its entirety, the evidence shows that appellants systematically and wrongfully misappropriated the funds; from the pattern established, a jury reasonably might discern appellants' conspiratorial agreement.

## B. *Admissibility of Evidence*

■ Appellants contend that the district court committed reversible error when it admitted certain testimonial evidence over appellants' objection. Ned Hersman, an agent with the F.B.I., was permitted to testify regarding the $5000 check that was made the basis of the embezzlement convictions. Specifically, Agent Hersman stated that he had gone to the Alabama Exchange Bank and unsuccessfully had attempted to locate a cancelled cashier's check that had been issued to the order of the I.R.S., in the amount of $5000 and in exchange for the proceeds of the MCCDC check, on or within the ten day period following April 12, 1983.

We need not decide whether Hersman's testimony was inadmissible, because any error which may have resulted from its admission was harmless. *See* Fed.R. Crim.P. 52(a). Hersman's testimony was merely cumulative; testimony of the I.R.S.

agent to the effect that no payment had been received from MCEDC on or about April 14, 1983, corroborated his testimony. *See L & C Marine Transport, Ltd. v. Ward,* 755 F.2d 1457, 1463 (11th Cir.1985); *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 307 (5th Cir.1978).

### C. Newly Discovered Evidence

■ Appellants argue that the district court abused its discretion when it failed to grant a new trial on the basis of newly discovered evidence. Following trial, appellants discovered a $9,235.98 cashier's check, listing G's as remitter, that had been sent to the I.R.S. on April 5, 1983, and had been negotiated by the I.R.S. on April 15, 1983. Appellants contend that the check evidences Burton's payment of MCEDC's payroll taxes and directly contradicts the I.R.S. agent's testimony that no payment had been received from MCEDC on or about April 15, 1983.

■ To support the grant of a new trial on the basis of newly discovered evidence, a defendant must show that: (1) the evidence is newly discovered and was unavailable at the time of trial; (2) the evidence is material and not merely impeaching or cumulative; (3) the evidence is such that it probably would produce an acquittal; and (4) the failure to discover such evidence was not due to a lack of diligence on the part of the defendant. *United States v. Sjeklocha,* 843 F.2d 485, 487 (11th Cir. 1988); *United States v. Williams,* 816 F.2d 1527, 1530 (11th Cir.1987); *Bentley v. United States,* 701 F.2d 897, 898 (11th Cir. 1983). Appellants did not satisfy their burden for two reasons. First, they failed to establish that the evidence was "unavailable" at the time of trial and that their failure to discover the evidence sooner was not due to their own lack of diligence. Second, the evidence is not such that it would produce an acquittal. In fact, it is doubtful that the evidence is in any way probative of Burton's alleged payment of MCEDC's taxes. The "newly discovered" check was purchased and sent by G's, not MCEDC, was for $9,235.98, not $5,000, and was dated and sent to the I.R.S. nine days

prior to the date on which Burton allegedly purchased the money order or cashier's check and allegedly sent the check to the I.R.S.

### D. Duplicitous Indictment

■ Appellants finally contend that the district court erred as a matter of law when it failed to conclude that the indictment contained duplicitous counts. In support of their position, appellants note that the substantive counts of the indictment charge appellants with violating 18 U.S.C. § 641 by *embezzling and converting* money of the United States to their own use or the use of others. Appellants maintain that each substantive count charges them with two separate and distinct offenses, rendering those counts duplicitous and the indictment invalid. This issue is misconceived.

■ A duplicitous indictment charges two or more separate and distinct crimes in a single count. *United States v. UCO Oil Co.,* 546 F.2d 833, 835 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). Where a penal statute, such as 18 U.S.C. § 641, prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment, however, the indictment may charge any or all of the acts conjunctively, in a single count, as constituting the same offense, and the government may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute. *See United States v. Acosta,* 748 F.2d 577, 579 (11th Cir.1984); *Fields v. United States,* 408 F.2d 885, 887 (5th Cir. 1969); *Smith v. United States,* 234 F.2d 385, 389 (5th Cir.1956); *United States v. Selage,* 175 F.Supp. 439, 442 (W.D.S.D. 1959). The conjunctive allegations do not render the indictment duplicitous.

■ The first paragraph of 18 U.S. C. § 641 (1982) identifies several acts disjunctively and prescribes that each constitutes a violation of the statute, provided that the acts involve "any record, voucher, money, or thing of value of the United States or of any department or agency

## 1574

thereof, or any property made or being made under contract for the United States or any department or agency thereof." The acts of embezzling and converting government property simply constitute two separate ways in which a violation of 18 U.S.C. § 641 may occur, not two separate crimes. An indictment is not duplicitous if, in one count, it charges a defendant with violating the statute in both ways.[3]

### III. CONCLUSION

For the foregoing reasons, the judgments of conviction are hereby

AFFIRMED.

---

**3.** Appellants present several additional claims on appeal, which merit only summary discussion. First, appellants contend that the district court committed reversible error by admitting into evidence, in violation of Federal Rules of Evidence 402 and 403, a check that was neither authorized nor signed by either appellant. We reject this assertion. Although the check probably was not relevant to establishing the guilt of appellants, in light of the overwhelming number of other, relevant items of evidence, it cannot seriously be contended that the introduction of this check would justify a reversal of appellants' convictions. *See* Fed.R.Crim.P. 52(a).

Appellant Balogun also argues that the district court erred in denying his motion for judgment of acquittal, made at the close of the government's case, grounded upon the assertion that he was a victim of selective prosecution. This contention must fail. "To support a defense of selective ... prosecution, a defendant must establish *first,* that he has been singled out for prosecution while others similarly situated have not generally been proceeded against for the type of conduct with which he has been charged, and *second,* that the decision to prosecute was invidious or in bad faith because it was based upon an impermissible factor such as race." *United States v. Gordon,* 817 F.2d 1538,

1539 (11th Cir.1987) *modified,* 836 F.2d 1312 (11th Cir.1988). *See also United States v. Pleasant,* 730 F.2d 657 (11th Cir.1984) *cert. denied,* 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984). Pretermitting the question of whether a selective prosecution argument was waived when not raised pretrial, *see* Fed.R.Crim.P. 12(b), no evidence was offered to support either prong of the defense.

Finally, appellants contend that the district court erred when it charged the jury that an intent temporarily to embezzle money is criminal pursuant to 18 U.S.C. § 641. This argument is meritless. Appellants would have this court conclude that the intent temporarily, wrongfully, and willfully to deprive the government of the use and benefit of money which it had entrusted to appellants' care is not a requisite intent for the crime of embezzlement. Under appellants' contention, if one were to intend to repay money to the government at the time of the wrongful taking, then one would lack the requisite "animus furandi" to commit the crime of embezzlement. The law simply does not make such a distinction. *See United States v. Shackelford,* 777 F.2d 1141 (6th Cir.1985) *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986); *United States v. Waroneck,* 582 F.2d 1158 (7th Cir.1978).