[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-15057
Non-Argument Calendar

_____

D.C. Docket No. 5:17-cr-00050-JDW-PRL-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SANTONIO JUVON JACKSON,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 1, 2020)

Before MARTIN, ROSENBAUM, and GRANT, Circuit Judges.

PER CURIAM:

Santonio Juvon Jackson appeals his convictions and concurrent 240-month sentences for conspiring to distribute or possess with intent to distribute and distributing or possessing with intent to distribute a controlled substance.  Jackson contends that the district court (1) abused its discretion in admitting "prior bad act" evidence about his history of drug transactions with a witness and plainly erred in not finding that the government's questioning of the witness to elicit that testimony constituted prosecutorial misconduct; (2) plainly erred in using the government's proposed verdict form, which Jackson alleges differed from the indictment in material ways, or in the alternative, plainly erred in failing to conclude that the indictment was duplicitous; and (3) plainly erred in sentencing him as a career offender under § 4B1.1 of the United States Sentencing Guidelines.  We affirm.

## I.

A federal grand jury returned an indictment charging that on or about October 26, 2017, Jackson distributed and possessed with intent to distribute "a controlled substance, which violation involved 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and a detectable amount of fentanyl, a Schedule II controlled substance," in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and punishable as provided in 21 U.S.C. § 841(b)(1)(B) (Count 1), and that from on or about October 26, 2017 through on or about October 30, 2017, Jackson conspired with

2

others to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846, again stating that the "violation involved 100 grams or more of a mixture and substance containing" detectable amounts of heroin and fentanyl, punishable as provided in 21 U.S.C. § 841(b)(1)(B) (Count 2). Jackson pleaded not guilty and proceeded to trial.

Before trial, Jackson moved in limine to exclude evidence of drug activity between him and a prosecution witness, John Chesnet, that occurred before the time frame of the indictment. The government responded that it intended to ask Chesnet about his prior arrangement with Jackson regarding the price of heroin but did not otherwise intend to present evidence of earlier drug transactions unless Jackson opened the door to such testimony. The court granted Jackson's motion to the extent that it addressed prior bad acts that were beyond the scope of the indictment, noting that the government could demonstrate the relationship between Chesnet and Jackson "without getting into specific conduct." The court instructed the government to approach the court before asking about specific prior acts if the prosecutor believed that Jackson had opened the door to such evidence.

At trial, the government called Chesnet to testify about a videotaped drug transaction between him and Jackson, in which Jackson delivered to Chesnet approximately six ounces (later determined to be 167 grams) of a substance containing heroin and fentanyl. Chesnet testified that he had been arrested for

3

narcotics offenses in September 2017 and had agreed to cooperate with law enforcement in the hope of getting a lower sentence for those offenses. Chesnet said that Jackson was his source of supply for heroin, and that he and Jackson had a prior arrangement that Chesnet would pay $3,000 per ounce for heroin. Chesnet testified that during the videotaped transaction, Jackson delivered a package containing about six ounces of heroin to Chesnet and told Chesnet that he owed $18,000 for the drugs. A few days later, Chesnet called Jackson at the direction of law enforcement officers and arranged to make a partial payment of $5,000. According to Chesnet, Jackson told him during that phone call that he would front Chesnet some cocaine too.

On cross examination, Jackson's attorney noted that part of the alleged heroin transaction was not visible on video. Counsel implied that the heroin that Chesnet claimed had come from Jackson really belonged to Chesnet, pointing out that Chesnet had large quantities of heroin and cocaine in his possession when he was arrested in September 2017. He also implied that Jackson had actually given Chesnet money, not heroin, and that the money was a personal gift or loan to help with Chesnet's bail and legal fees. Counsel challenged Chesnet's testimony that Jackson had given him $18,000 worth of heroin on credit:

> Q. So somebody is going to give you street value of 18- $30,000 worth of drugs and, as you say, front it, and then just hope that you pay them?
> A. That's right.
> Q. Okay. And in this particular case, you hadn't paid them any money –

4

according to you, you said you owed him $30,000. Is that in addition to the–

A. No.

Q. That's including the new stuff that you claimed you got?

A. It was 10- at first.

Q. What do you mean "at first"?

A. Prior to the 18-.

Q. Oh, so you had an outstanding debt of 10- that you were behind on?

A. Yeah.

Q. So now he's going to give you 18- more, because you're behind on 10-?

A. That's right.

Q. Okay. And now this is where the $30,000 comes in? Is that what you're telling me?

A. That's right.

. . .

Q. But you just -- supposedly just got $18,000 worth of heroin?

A. Yeah.

Q. And you were going to get cocaine now on top of heroin?

A. Uh-huh (affirmative).

Q. And you still owed this man $30,000?

A. Uh-huh (affirmative).

Q. Does that make any sense to you?

A. To me it does, yeah.

After establishing that Chesnet expected to receive between $4,000 and $18,000 in cocaine from Jackson, counsel continued:

Q. All right. So we're going to double down. You're in the hole now 18- to 28,000. We're going to throw another 18,000 on the pot. So you're going to be in the hole almost 50 grand here?

A. Well, no. Usually I bring more than half of that back.

Q. Well, but -- yeah. But you have no history, according to this testimony that we have here today. All you came up with was supposedly $5,000. Whose idea was it to pay $5,000?

A. The officers.

On redirect, the prosecutor had the following exchange with Chesnet:

5

Q.	So, Mr. Chesnet, now that you've answered a number of questions from [defense counsel] about your history of drug activities from Mr. Jackson, let's go into a little more detail about that. You mentioned on -- on or around September 27th you were arrested on a number of state warrants for trafficking in heroin?

A.	Yes, sir.

Q.	Where did you get that heroin from?

A.	Santonio.

Q.	Did you owe him money for that heroin?

A.	At that time I owed him 10,000.

Q.	All right. [Defense counsel] was asking you why on earth Mr. Jackson would front you drugs if you already owed him a great deal of money. Did you have a history of accepting drugs on consignment from Santonio Jackson?

A.	Yes, sir.

Q.	How far back did that history go?

[DEFENSE COUNSEL]: Objection, Your Honor. Outside the -- well outside the scope.

THE COURT: Overruled.

BY [THE PROSECUTOR]:

Q.	Go ahead.

A.	Since about, like, March of -- February or March of '17.

Q.	So would it be correct to say that you've been accepting narcotics from Santonio Jackson and selling them, and then paying him back with some of the proceeds of those sales since March of 2017?

A.	Yes, sir.

Q.	Did you have a well-established history of selling drugs on consignment for Mr. Jackson from March to September?

A.	Yes, sir.

Q.	Might that have been a reason why he would be comfortable fronting you large amounts of narcotics while you still owed him money?

A.	Yes, sir.

Q.	And, in fact, wasn't it Mr. Jackson's practice to keep you perpetually in debt? Were you ever able to clear your debt with Mr. Jackson during the course of your drug dealings with him?

A.	No, sir.

6

Q.    What was the typical arrangement for -- like, when Mr. Jackson would show up to front you narcotics, would he ask you how much you wanted?

A.    No.

Q.    Would he ask you what kind you wanted?

A.    No.

Q.    Would he just show up with whatever he wanted to give you at that date and tell you what you owed him?

A.    Yes, sir.

The jury found Jackson guilty on all counts charged in the indictment. With Jackson's consent,[1] the court used the government's proposed verdict form, which included special interrogatories regarding the type and quantity of drug involved in each count. The jury found that Jackson's offenses involved "a mixture and substance containing a detectable amount of heroin in the amount [of] One hundred (100) grams or more" and "a mixture and substance containing a detectable amount of fentanyl in the amount [of] Forty (40) grams or more."

Based on these drug-quantity findings and Jackson's prior felony drug convictions, the district court determined that Jackson was subject to an enhanced statutory sentencing range of ten years to life under 21 U.S.C. § 841(b)(1)(B). The court also determined that Jackson qualified as a career offender under the Sentencing Guidelines because his conviction on Count 1 was a controlled-substance offense and he had two prior Florida felony convictions for controlled-

---

[1] Jackson initially objected to the verdict form, but affirmatively withdrew his objection after the close of evidence at trial.

7

substance offenses.  *See* U.S.S.G. § 4B1.1(a).  As a career offender, Jackson's Sentencing Guidelines range was 360 months to life in prison.  Over the government's objection, the district court varied downward from the Guidelines range and sentenced Jackson to 240 months' imprisonment and eight years' supervised release.  This is Jackson's appeal.

## II.

Jackson argues that the district court erred by admitting Chesnet's testimony concerning prior drug transactions with Jackson outside the scope of the October 2017 conspiracy alleged in the indictment, and that the admission of that testimony deprived him of a fair trial.  For the first time on appeal, he also contends that the government's questioning that elicited the "prior bad act" testimony constituted prosecutorial misconduct.

## A.

We review the district court's evidentiary rulings, including the admission of "prior bad act" evidence under Federal Rule of Evidence 404(b), for abuse of discretion.  *United States v. Gari*, 572 F.3d 1352, 1361 (11th Cir. 2009).  Under Rule 404(b), evidence of a defendant's prior bad conduct is not admissible to prove that the defendant was of bad character and that he committed the charged crime in conformity with that character.  Fed. R. Evid. 404(b)(1).  But the evidence may be admissible for other purposes, "such as proving motive, opportunity, intent,

8

preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Fed. R. Evid. 404(b)(2).  "To be admissible under Rule 404(b)(2), a prior act

(1) must be relevant to an issue other than defendant's character, (2) must be

sufficiently proven to permit a jury determination that the defendant committed the

act, (3) must have probative value that is not substantially outweighed by undue

prejudice, and (4) must otherwise satisfy Federal Rule of Evidence 403."[2]

*United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017).

We have no difficulty concluding that evidence of Jackson's prior drug

transactions with Chesnet was admissible under Rule 404(b).  First, Jackson's prior

drug activity was relevant to the issue of intent.  A defendant's not guilty plea to a

drug conspiracy charge "makes intent a material issue and opens the door to

admission of prior drug-related offenses as highly probative, and not overly

prejudicial, evidence of a defendant's intent."  *United States v. Smith*, 741 F.3d

1211, 1225 (11th Cir. 2013) (quoting *United States v. Calderon*, 127 F.3d 1314,

1332 (11th Cir. 1997)).  Second, Chesnet's testimony that Jackson had given him

drugs on consignment before was sufficient to allow the jury to find that Jackson

committed those prior offenses.  *See United States v. Dickerson*, 248 F.3d 1036,

---

[2] Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

1047 (11th Cir. 2001) ("the uncorroborated word of an accomplice" is sufficient to connect the defendant to prior uncharged crimes for purposes of 404(b) (citation omitted)).

Third, the probative value of the evidence was not outweighed by the risk of unfair prejudice, confusion, misleading the jury, or inefficiency. The probative value of prior drug activity is especially high where, as here, the defendant questions the credibility of the government's witness on the issue of intent or implies that he was merely present at the scene and did not participate in the charged offense. See *Calderon*, 127 F.3d at 1332; *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995) (affirming the introduction of prior bad acts evidence in part because the defendant "presented a 'mere presence' defense, forcing the government to prove his criminal intent so as to negate any innocent explanation for his presence"). And contrary to Jackson's characterization of the evidence as severely prejudicial, we have said before that "extrinsic drug offenses do not tend to incite a jury to an irrational decision." *Delgado*, 56 F.3d at 1366. The district court also gave a limiting instruction to the jury regarding the evidence of prior transactions, which reduced the risk of undue prejudice. *See United States v. Wilchcombe*, 838 F.3d 1179, 1193 (11th Cir. 2016).

In any event, Jackson opened the door to Chesnet's testimony about his prior dealings with Jackson by questioning the source of Chesnet's debt to Jackson and

10

implying that Jackson would never give him heroin without payment if Chesnet already owed him money. Otherwise inadmissible extrinsic evidence is admissible on redirect examination to explain or clarify testimony elicited by defense counsel during cross examination. *See United States v. West*, 898 F.2d 1493, 1500 (11th Cir. 1990); *United States v. Elliott*, 849 F.2d 554, 559 (11th Cir. 1988). And evidence that is "not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime," is admissible without regard to Rule 404(b) if it is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. Holt*, 777 F.3d 1234, 1262 (11th Cir. 2015) (quoting *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998)). Because defense counsel's cross examination raised questions about the source of Chesnet's debt to Jackson and why Jackson would give Chesnet $18,000 worth of drugs on credit, the government could elicit testimony on redirect to clarify or explain those issues. The district court did not abuse its discretion in admitting Chesnet's testimony about his history of drug transactions with Jackson.

## B.

We generally review determinations regarding prosecutorial misconduct de novo. *United States v. Rivera*, 780 F.3d 1084, 1090 (11th Cir. 2015). But when

the defendant fails to object to the alleged misconduct contemporaneously, we review the claim for plain error. *Id.* To prevail on plain-error review, the appellant must show an error that is plain or obvious and that affected the defendant's substantial rights. *Id.* We may exercise our discretion to correct a plain error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

To qualify as misconduct, a prosecutor's questions must be (1) improper and (2) "prejudicial to the defendant's substantial rights." *Id.* at 1096. "If the defendant cannot show that the prosecutor's conduct was improper, the prosecutorial misconduct claim must fail." *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997). Substantial rights are prejudiced when there is a reasonable probability that, but for the misconduct, the outcome of the trial would have been different. *Rivera*, 780 F.3d at 1096.

Here, the prosecutor's questions eliciting testimony from Chesnet about his prior arrangements with Jackson were not improper because defense counsel opened the door to such testimony on cross examination. Chesnet's testimony about their history of drug transactions was admissible to explain why Jackson would give him drugs on consignment and to clarify the source of his preexisting debt to Jackson. And although the prosecutor should have complied with the court's order to request a bench conference before eliciting the testimony, his

12

failure to do so did not affect Jackson's substantial rights because the district court heard and overruled Jackson's objection to the evidence.

### III.

Next, Jackson argues that the verdict form differed from the indictment in significant ways, and that his convictions and sentences are therefore invalid. Specifically, he argues that (1) the indictment charged him with drug offenses involving 100 grams or more of a controlled substance, but the verdict form permitted the jury to find him guilty of offenses involving an unspecified quantity of drugs; (2) the indictment alleged that the controlled substance involved in his offenses contained both heroin and fentanyl, but the verdict form asked the jury to find whether his offenses involved heroin or fentanyl; and (3) the indictment alleged that he distributed or conspired to distribute 100 grams or more of a substance containing unspecified amounts of heroin and fentanyl, but the verdict form asked the jury to determine the weight of heroin or fentanyl in the substance, rather than the weight of the mixture as a whole.

Jackson argues that these differences permitted the jury to make findings regarding drug quantities not charged in the indictment, so that the court's use of the verdict form constituted a constructive amendment of the indictment and his sentence based on the jury's drug-quantity findings was unconstitutional. "A constructive amendment occurs 'when the essential elements of the offense

13

contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'" *Holt*, 777 F.3d at 1261 (quoting *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004)). "A constructive amendment 'is *per se* reversible error.'" *Id*. (quoting *Narog*, 372 F.3d at 1247).

In the alternative, Jackson argues that if the indictment matched the verdict form, then the indictment was duplicitous because it charged two offenses in each count—one involving heroin, and the other involving fentanyl. *See United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989) ("A duplicitous indictment charges two or more separate and distinct crimes in a single count."). Because Jackson failed to make his arguments regarding the indictment and the verdict form to the district court, our review is for plain error only. *See Holt*, 777 F.3d at 1261; *United States v. Barrington*, 648 F.3d 1178, 1190 n.6 (11th Cir. 2011); *United States v. Acevedo*, 285 F.3d 1010, 1011–12 (11th Cir. 2002).

## A.

Jackson argues that the indictment charged different offenses than those presented on the verdict form because the indictment alleged that his offenses involved 100 grams or more of a controlled substance, triggering the penalties set out in 21 U.S.C. § 841(b)(1)(B), whereas the verdict form permitted the jury to find him guilty of offenses involving an unspecified drug quantity, punishable under 21 U.S.C. § 841(b)(1)(C). These arguments are based on Jackson's

14

misreading of the indictment, the verdict form, and the federal drug trafficking statute, 21 U.S.C. § 841.

The indictment alleged that Jackson distributed or possessed with intent to distribute a controlled substance (Count 1) and that he conspired to distribute or possess with intent to distribute a controlled substance (Count 2).  These allegations were sufficient to state a (single) violation of 21 U.S.C. § 841(a)(1) in Count 1 and a (single) violation of 21 U.S.C. § 846 in Count 2, without regard to the type or quantity of controlled substance involved.  *See United States v. Sanders*, 668 F.3d 1298, 1309 (11th Cir. 2012) ("a person violates § 841(a) merely by knowingly possessing with intent to distribute a controlled substance"; "the specific amount and type of drugs are not elements of the [§ 841(a)(1)] offense" (alteration in the original) (citation omitted)); *United States v. Parrado*, 911 F.2d 1567, 1570 (11th Cir. 1990) ( "To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove that there is an agreement by two or more persons to violate the narcotics laws.").

Under 21 U.S.C. § 841(b), however, the type and quantity of drugs involved is a key factor in determining the statutory sentencing range for a drug trafficking offense.  For a defendant like Jackson with one or more qualifying prior drug convictions, a violation of § 841(a) or § 846 involving an unspecified quantity of heroin or fentanyl is punishable by up to 30 years' imprisonment and at least 6

15

years' supervised release.  21 U.S.C. § 841(b)(1)(C).  But an offense involving either 100 grams or more of a substance containing heroin or 40 grams or more of a substance containing fentanyl is punishable by ten years to life in prison, followed by at least eight years' supervised release.  21 U.S.C. § 841(b)(1)(B)(i) & (b)(1)(B)(vi).  Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), therefore, the government was required to allege the relevant drug type and quantity in the indictment and prove those facts to the jury beyond a reasonable doubt before Jackson could be subjected to the enhanced penalties in § 841(b)(1)(B).  *See Apprendi*, 530 U.S. at 489; *Sanders*, 668 F.3d at 1309–10.  Jackson's indictment complied with this requirement by alleging that his drug trafficking offenses involved 100 grams or more of a substance containing heroin and fentanyl.[3]

In other words, the allegations in the indictment followed the structure of the drug trafficking statute by alleging conduct that violated § 841(a)(1) or § 846 and also alleging facts that, if proven, would trigger enhanced penalties under § 841(b)(1)(B).  Contrary to Jackson's assertions, the verdict form corresponded to the indictment, in that it asked the jury to find Jackson guilty or not guilty of the

---

[3] Specifically, the indictment charged that Jackson's offenses "involved 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and a detectable amount of fentanyl, a Schedule II controlled substance, and is therefore punished under 21 U.S.C. § 841(b)(1)(B)."  To the extent that Jackson argues that this language described 100 grams of a substance containing heroin and an unspecified amount of a second substance containing fentanyl (and that his sentence should have been based on the latter substance), that contention is plainly wrong and warrants no further discussion.

charged offense, and if guilty, to make further findings about the type and quantity of controlled substance involved. We have previously upheld the use of a verdict in this format. *See United States v. Clay*, 355 F.3d 1281, 1285 (11th Cir. 2004). The district court did not err, much less plainly err, by using a verdict form that allowed the jury to make separate findings regarding drug quantity if it found that he was guilty of the charged offense. *See id.*

## B.

Jackson also contends that the verdict form constructively amended the indictment and led to the imposition of an unconstitutional sentence because the indictment charged him with distributing or conspiring to distribute a substance containing heroin *and* fentanyl, but the verdict form permitted the jury to find him guilty if it determined that his offenses involved heroin *or* fentanyl. He also notes that the indictment alleged that the substance containing fentanyl weighed more than 100 grams, but the verdict form asked the jury whether the substance containing fentanyl weighed 40 grams or more. In the alternative, Jackson argues that if the indictment matched the verdict form, then the indictment was duplicitous because it charged offenses involving two different controlled substances.

It is well settled, however, "that an indictment may charge numerous offenses or the commission of any one offense in several ways. As long as the crime and the elements of the offense that sustain the conviction are fully and

17

clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *United States v. Miller*, 471 U.S. 130, 136 (1985). This means that "where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive." *United States v. Simpson*, 228 F.3d 1294, 1300 (11th Cir. 2000); *see United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989). "The conjunctive allegations do not render the indictment duplicitous." *Burton*, 871 F.2d at 1573.

Here, the verdict form did not expand the bases for conviction beyond those that were alleged in the indictment. To the contrary, the charges in the indictment fully encompassed the findings that the jury was asked to make. Again, the indictment charged Jackson with a single violation of 21 U.S.C. § 841(a)(1) in Count 1 by alleging that he distributed or possessed with intent to distribute a controlled substance, and charged him with a single violation of 21 U.S.C. § 846 in Count 2 by alleging that he conspired with others to distribute or possess with intent to distribute a controlled substance. *See* 21 U.S.C. §§ 841(a)(1), 846. The indictment charged that Jackson violated the relevant statutes in multiple ways, in that his offenses involved multiple controlled substances. But because proof that Jackson distributed and conspired to distribute any controlled substance was

18

sufficient to support convictions on the counts charged, Jackson could be found guilty as charged if his offenses involved either heroin or fentanyl, and the district court did not plainly err in using a verdict form that instructed the jury accordingly.

Similarly, the indictment charged that Jackson's offenses involved 100 grams of a substance containing heroin and fentanyl, although proof that the offenses involved 100 grams of a substance containing heroin alone, or 40 grams of a substance containing fentanyl alone, was sufficient to expose Jackson to the enhanced penalties in 21 U.S.C. § 841(b)(1)(B).  *See* 21 U.S.C. § 841(b)(1)(B)(i) (providing that a violation of § 841(a) involving "100 grams or more of a mixture or substance containing a detectable amount of heroin" is punishable under § 841(b)(1)(B));  21 U.S.C. § 841(b)(1)(B)(vi) (same for an offense involving "40 grams or more of a mixture or substance containing a detectable amount of [fentanyl]").  By alleging that Jackson possessed with intent to distribute, and conspired to distribute, 100 grams or more of a substance containing heroin and fentanyl, the government also necessarily alleged that he possessed with intent to distribute and conspired to distribute 100 grams or more of a substance containing heroin, and 40 grams or more of a substance containing fentanyl.  Thus, the options offered to the jury on the verdict form were fully contained within the indictment, and the verdict form did not constructively amend the indictment.  *See Miller*, 471 U.S. at 136; *Simpson*, 228 F.3d at 1300.

19

C.

Jackson's final argument regarding the verdict form is based on a misreading of the special interrogatories. Jackson argues that the special interrogatories asked the jury to find the weight of heroin or fentanyl in the mixture he possessed, rather than the overall weight of the mixture as alleged in the indictment, and that the district court plainly erred in relying on the jury's responses to the special interrogatories in determining his statutory sentencing range. We disagree.

For each count, the verdict form asked the jury to complete special interrogatories regarding drug quantity if it found Jackson guilty of the underlying offense. For example, the special interrogatories for Count 1 stated, "We, the Jury, having found the defendant, SANTONIO JUVON JACKSON, guilty of the offense charged in Count One, further find as to that Count that he distributed or possessed with the intent to distribute a mixture and substance containing a detectable amount of heroin in the amount shown," and asked the jury to choose (a) less than 100 grams, or (b) 100 grams or more. A second, similarly worded interrogatory asked the jury to find whether Jackson's offense involved "a mixture and substance containing a detectable amount of fentanyl in the amount" of (a) less than 40 grams, or (b) 40 grams or more.

Although this language is not a model of clarity, the most natural reading of the verdict form in the context of the indictment and the evidence presented at trial

20

is that the special interrogatories asked the jury to determine whether the "mixture

or substance" containing heroin weighed 100 grams or more, and whether the

"mixture or substance" containing fentanyl weighed 40 grams or more—in other

words, the special verdict form asked the jury to make the factual findings

necessary to determine Jackson's statutory sentencing range under § 841(b)(1)(B),

as charged in the indictment.  *See* 21 U.S.C. § 841(b)(1)(B)(i) & (b)(1)(B)(vi).  The

district court did not plainly err in relying on these findings to determine that

Jackson was subject to the enhanced penalties provided by 21 U.S.C.

§ 841(b)(1)(B).

IV.

For the first time on appeal, Jackson argues that the district court erred in

calculating his Guidelines sentencing range under the career-offender guideline,

U.S.S.G. § 4B1.1.[4]  According to § 4B1.1, a "defendant is a career offender if

(1) the defendant was at least eighteen years old at the time the defendant

committed the instant offense of conviction; (2) the instant offense of conviction is

a felony that is either a crime of violence or a controlled substance offense; and

(3) the defendant has at least two prior felony convictions of either a crime of

violence or a controlled substance offense."  U.S.S.G. § 4B1.1(a).  A "controlled

---

[4] Because Jackson failed to challenge his sentence on this ground in the district court, our review is for plain error only.  *See United States v. Bonilla*, 579 F.3d 1233, 1238 (11th Cir. 2009).

21

substance offense" is defined as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits," among other things, the distribution or possession with intent to distribute a controlled substance. *Id.* § 4B1.2(b).

Jackson argues that his "instant offense of conviction"—namely, the violation of 21 U.S.C. § 841(a) charged in Count 1—does not qualify as a controlled substance offense under § 4B1.1 because § 841(a) "contains no penalty provision and therefore does not categorically define a federal felony offense." This argument borders on the frivolous. The penalty provisions for a violation of § 841(a) are provided by § 841(b). Under § 841(b)(1), any violation of § 841(a) is "punishable by a term of imprisonment exceeding one year." U.S.S.G. § 4B1.2(b); *see* 21 U.S.C. § 841(b)(1)(A)–(C). Given Jackson's record of prior felony drug convictions, his offense, which involved 100 grams of a substance containing heroin and fentanyl, was punishable by a minimum of ten years and a maximum of life in prison. 21 U.S.C. § 841(b)(1)(B)(i) & (b)(1)(B)(iv) (2010). The district court did not plainly err in sentencing Jackson as a career offender.

## V.

For the reasons stated, we affirm Jackson's convictions and 240-month sentences.

**AFFIRMED**.

22